IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 17, 2021

## CLARENCE E. MCCALEB v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 117586    Kyle A. Hixson, Judge**

_____

### No. E2021-00201-CCA-R3-PC

_____

The Petitioner, Clarence E. McCaleb, appeals from the Knox County Criminal Court's dismissal of his petition for post-conviction DNA analysis. The petition sought DNA testing of a fork found on the victim's bedroom floor. The Petitioner now appeals, arguing that DNA analysis of the fork would result in a reasonable probability that he would not have been prosecuted or convicted if DNA profiles inconsistent with the Petitioner's and the victim's were discovered. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JILL BARTEE AYERS, JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the appellant, Clarence E. McCaleb.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Charme P. Allen, District Attorney General; and Joanie Stallard Stewart, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### TRIAL

The Petitioner was convicted of two counts of aggravated rape, two counts of aggravated robbery, and two counts of aggravated burglary. See State v. Clarence Edward McCaleb, No. E2008-00521-CCA-R3-CD, 2009 WL 537061 (Tenn. Crim. App. Mar. 4,

2009), perm. app. denied (Tenn. June 15, 2009). He received a total effective sentence of life plus thirty years.

At trial, the fifty-six-year-old victim testified that on September 24, 2004, she was living in an apartment complex in Knoxville with her two grandchildren. McCaleb, 2009 WL 537061, at *1. That night she left work around 12:15 or 12:30 a.m., picked up her grandchildren from her daughter's apartment, and went home. After putting her grandchildren to bed, the victim went to sleep around 2:00 a.m. wearing a nightgown and underwear. After falling asleep, the victim sensed light coming from her grandchildren's room, and she saw an outline of someone at her bedroom door. The victim testified that as she was trying to wake up, she saw a black male at her door wearing a hat. The man pushed her on her bed when she tried to get up. The man hit her with something that she believed to be a knife because the object was sharp and had "a gleam."

The victim testified that the man held her to the bed with his hand and knee and told her, "[D]on't scream, don't get up," and "give me all your money." McCaleb, 2009 WL 537061, at *1. The man took $50 from the dresser in the victim's bedroom. After taking the money, the man removed the victim's underwear and proceeded to rape her. The victim said that she experienced pain while the man raped her and that she was scared. She said that the rape lasted about five minutes and that the man did not ejaculate. The man then tried to put his penis in the victim's mouth, but ultimately pleasured himself while standing over the victim. The victim went to the bathroom following the rape, but the man would not allow her to close the door. The victim identified the Petitioner as the man who raped her.

The victim ran from the apartment following the attack and called her daughter and 9-1-1. McCaleb, 2009 WL 537061, at *2. The victim was examined at the hospital. She testified that although she usually wore eyeglasses, she did not have them on at the time of the attack because she had been asleep. She was able to identity the Petitioner in a photographic lineup and denied knowing the Petitioner prior to the attack. She testified that police found a steak fork in her bedroom, but that the fork was not in her bedroom when she fell asleep.

A Knoxville Police Department ("KPD") officer testified that he responded to a call in the early morning hours of September 5, 2004. McCaleb, 2009 WL 537061, at *2. The call was related to a burglary and rape. Upon arrival, the officer found the victim inside her apartment and described her condition as being agitated, upset, and crying. The

victim's statement was recorded. In the recording, she stated that she was awakened by someone slapping her in the face.

The officer testified that the dispatch described the suspect as a black male wearing a blue shirt. McCaleb, 2009 WL 537061, at *2. A suspect matching the description was seen entering a different apartment in the complex, and the officer knocked on that apartment door and received permission to enter. The officer found the Petitioner hiding between the mattress and box springs of a bed, arrested him, and transported him to the police department.

A criminal investigator with the KPD testified that he responded to the victim's apartment on the morning of September 5, 2004. McCaleb, 2009 WL 537061, at *2. The victim had already been transported to the hospital when he arrived. The investigator found no useable fingerprints in the victim's home. At the hospital, the victim told the investigator that a man came into her bedroom, threatened to kill her, asked for money, and raped her. She described the man as a black male with a beard, mustache, or goatee and wearing a blue shirt and shorts and identified the Petitioner from a photographic lineup. Id. at *3.

A sexual assault nurse examiner testified that she interviewed and examined the victim at the University of Tennessee Hospital on September 5, 2004. McCaleb, 2009 WL 537061, at *3. She testified that the victim had an abrasion on her right temple, an area of tenderness on the left side of her forehead, a reddened area on the right side of her neck, and several instances of trauma on the victim's genitalia. The examiner testified that the victim's injuries were consistent with penile penetration and forcible rape. The examiner asserted that the medical report contained a clerical error indicating that the victim had not been vaginally penetrated. She maintained that the remark was an error and that her handwritten notes clearly indicated that the victim had been vaginally penetrated.

The Petitioner testified that on the day of the incident, he was "kicking and drinking" with some friends at Austin Homes apartment complex. McCaleb, 2009 WL 537061, at *3. The Petitioner was on a "No Trespass List" for the complex. He said that he had been smoking marijuana, cocaine, and drinking beer during the day. The Petitioner said a man knocked on the door of the apartment around 5:30 a.m., and his friend let the man into the apartment. The Petitioner testified that the man was breathing hard, so he asked him, "You ain't did nothing, have you?" The man left the apartment through the back door. The police came to the door about fifteen minutes later, and the Petitioner hid because he did

-3-

not want to be arrested for trespassing, for possessing drugs, or for possessing a gun. The police found him, and he was arrested for trespassing. The Petitioner was wearing a blue shirt and shorts when he was arrested.

The Petitioner denied committing the crimes against the victim. McCaleb, 2009 WL 537061, at *4. He testified that he was high on cocaine at the time and would not have been able to perform rape. The Petitioner said he had been in and out of the apartment on the night of the incident. He acknowledged his criminal history, including prior thefts, a robbery, and a burglary.

The jury returned a verdict of guilty on all six counts, and following a sentencing hearing, the Petitioner was sentenced to life on both Class A felony convictions. McCaleb, 2009 WL 537061, at *4. The trial court concluded that the Petitioner was a repeat violent offender. The Petitioner was sentenced to twenty years on each Class B felony conviction and to ten years on each Class C felony conviction. The trial court ordered that one sentence for each Class A, B, and C felony be served consecutively to each other and that all other convictions be served concurrently.

The Petitioner appealed and this court found that the evidence was sufficient to support his convictions and that the Petitioner's sentence was proper. McCaleb, 2009 WL 537061, at *11. This court did find that some of the Petitioner's convictions should have been merged and remanded that issue to the trial court. Id.

**POST-CONVICTION HEARING**

The Petitioner filed a pro se motion requesting DNA analysis on September 13, 2019, and counsel was appointed on June 22, 2020. A memorandum in support of his request was filed on September 9, 2020. In his petition, he requested that the steak fork found in the victim's bedroom be subjected to DNA analysis. The Petitioner argued that if the fork contained DNA samples that were inconsistent with the victim or the Petitioner, that evidence would be exculpatory. However, the Petitioner also acknowledged that inconsistent samples would not rule out DNA consistent with the victim's grandchildren who also lived in the apartment, or some unidentified guest. At the time of the petition, the Petitioner did not know if the fork was in possession of the court.

The State responded that although the fork had not been entered into evidence at trial, the KPD had verbally confirmed that the fork was still in the agency's possession. The State was unable to determine how the evidence had been packaged and maintained in the almost twenty years since its collection. The ability to obtain a DNA sample from the victim was also unknown. Moreover, the State argued that there was no reasonable probability that the Petitioner would not have been prosecuted or convicted if the fork had been subjected to DNA analysis or that he would have received a more favorable verdict or sentence. Inconsistent DNA results would not have ruled out the possibility of the victim's grandchildren or a guest's DNA being present on the fork. The State notes that a fork is meant to be held and the location of the fork, on a fabric rug, made it susceptible to transference. At trial, the victim explicitly described the rapist; the Petitioner matched the description given and was wearing clothing as described; the Petitioner was found hiding within close proximity to the crime scene and within minutes of the victim's report; and the victim identified the Petitioner in a photographic lineup. The fork was never identified by the victim as being used against her during the attack.

On January 26, 2021, a post-conviction relief hearing was held, and arguments from both the Petitioner and the State were heard. The Petitioner argued that the victim's testimony that her attacker "hit her with something she thought was sharp" referred to the fork found beside her bed. The Petitioner argued that any DNA profiles found not matching the Petitioner or victim could create reasonable doubt for a jury.

The Petitioner stated that he was convicted "mainly on [the victim's] identification testimony" and that no physical evidence was introduced. The Petitioner pointed out that the victim's description of her attacker was not "very unique" and that the victim had been asleep and was not wearing her glasses when she was attacked. The Petitioner argued that a DNA profile from the victim could be obtained from the rape kit that was administered after the attack on the night of the incident.

The State responded that the description given by the victim was unique and that the Petitioner was arrested after he was found hiding in close proximity to the victim's apartment. The steak fork was never identified by the victim as the weapon used by the attacker, and she had described the weapon as a knife and did not testify for how long the weapon was held to her person during the attack.

The State asserted that the only available DNA analysis that could be performed on the fork was a form of touch analysis, which is the "least-preferred" method of DNA

analysis. This type of analysis would require a person to hold the object for an extended period of time. Additionally, the KPD Investigator testified at trial that he was not the individual who collected the fork, and no other specific details were known about the fork's collection or storage. There was no chain of custody log.

The post-conviction court concluded that the Petitioner had shown that the steak fork was never previously subjected to any sort of DNA analysis and that the Petitioner filed his petition in good faith. However, the court concluded that the Petitioner had failed to show that the fork had been collected in such a way that DNA analysis could be properly conducted. The Petitioner had failed to show that the fork had not been contaminated and had failed to prove the conditions of storage for some sixteen years since the incident. The court concluded that although some circumstantial evidence may have existed, the fork was never shown to have been the weapon used to attack the victim. Finally, the court concluded that testing the fork for DNA profiles would not result in exculpatory evidence. The Petitioner timely filed on appeal on February 24, 2021.

## ANALYSIS

The Petitioner argues that the post-conviction court erred when it declined to have the fork tested for DNA profiles because the Petitioner did not have access or the scientific expertise to determine if the fork could be tested for remaining DNA analysis. The Petitioner argues that even if the possible DNA profiles are unidentified, this evidence could be used to create reasonable doubt.

The State responds that possible unidentified DNA profiles or the absence of the Petitioner's DNA profile from the fork would not result in a reasonable probability that the Petitioner would not have been prosecuted or convicted. Additionally, the State notes that the victim had provided the police with a physical description of the attacker, that she chose the Petitioner from a photographic lineup, and that the Petitioner was arrested wearing clothing matching that description in close proximity within minutes of the victim's report. Finally, the State argues that the Petitioner failed to prove that the fork was preserved in a manner that would allow it to be analyzed for DNA.

The Post-Conviction DNA Analysis Act of 2001 provides:

[A] person convicted of and sentenced for the commission of first degree murder, second degree murder, aggravated rape, rape, aggravated sexual battery or rape of a child, the attempted commission of any of these offenses,

-6-

any lesser included offense of these offenses, or, at the direction of the trial judge, any other offense, may at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence.

Tenn. Code Ann. § 40-30-303.

A post-conviction court is obligated to order DNA analysis when a petitioner has met each of the following four conditions:

(1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;

(2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;

(3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn. Code Ann. § 40-30-304. This court has held that "the failure to meet any of the qualifying criteria is, of course, fatal to the action." William D. Buford v. State, No. M2002-02180-CCA-R3-PC, 2003 WL 1937110, at *6 (Tenn. Crim. App. Apr. 24, 2003).

Similarly, after notice to the prosecution and an opportunity to respond, the court may order DNA analysis if it finds that:

(1) A reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction;

(2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;

(3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn. Code Ann. § 40-30-305. This court had held that the petition must be dismissed "if the petitioner fails to establish each of the four criteria required pursuant to [] Code section 40-30-305." Eddie Medlock v. State, No. W2018-01693-CCA-R3-PC, 2019 WL 3071756, at *2 (Tenn. Crim. App. Apr. 23, 2019).

The post-conviction court found that the Petitioner failed to establish both the first and second factor required under section 40-30-304. The Petitioner's speculation that a lack of his DNA profile on the fork or that an unidentified individual's profile could be found does not create a reasonable probability that he would not have been prosecuted or convicted. The victim testified at trial that she provided a detailed description of her attacker to the police; she was able to identify the Petitioner in a photographic lineup, despite having no prior knowledge or interaction with him before the attack; and the Petitioner was seen entering a nearby apartment around the time of the report. Additionally, the Petitioner was found hiding under a mattress wearing clothing that matched the victim's description. An unidentified DNA profile from the fork could have been attributed to the victim's grandchildren who also lived with the victim in her home or even some unidentified guest. A fork, by its very nature, is a transient object and an unidentified profile would not have resulted in exculpatory evidence.

Although the Petitioner's failure to establish the first prong is fatal to his petition, we still choose to discuss the second prong because it was also addressed by the post-conviction court. The Petitioner also failed to show that the fork had been maintained in such a condition that DNA analysis could be conducted in a proper manner. Despite the State's discovery that the fork was still in police custody, there was no chain of custody log or details of how the fork had been stored and maintained. There is no evidence to show that the fork has not been contaminated or how long touch DNA exists on an object

-8-

of that nature.  Similarly, the Petitioner's failure to establish the second prong is fatal to his petition pursuant to Code section 40-30-304 and 40-30-305.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the post-conviction court's dismissal of the petition for post-conviction relief is affirmed.

_____

D. KELLY THOMAS, JR., JUDGE